SCHOTT, Judge.
On Sunday morning, March 7, 1971, plaintiff’s water intake facility in the Mississippi River was damaged when struck by a runaway barge, WBL-131. Made defendants were Wisconsin Barge Line, Inc. (Wisconsin) owner of the WBL-131, Port City Barge Lines, Inc. (Port City) owner of a second barge, PCBL-105, which was involved in the casualty, Sioux City and New Orleans Terminal Corp. (Sioux City) and Point Landing, Inc. Various third-party demands for indemnity and contributions were filed among the defendants. The trial court awarded a judgment in favor of plaintiff against Point Landing for $216,153.91, and in favor of Port City, Sioux City and Wisconsin against Point Landing for full indemnity including attorney fees, expenses and court costs. From this judgment only Point Landing has appealed. At issue are the liability of Point Landing, the exoneration from liability of Sioux City for contribution to Point Landing, the amount of damages' awarded, and the right of Port City and Wisconsin to indemnity.
LIABILITY
Point Landing operated a public fleeting facility for barges about 1400 yards upriver from plaintiff’s water intake facility. Sioux City maintained its own fleet just above Point Landing’s fleet. On February 28, 1971, Barge PCBL-105 was tied into the Point Landing fleet where it remained without incident until March 5, 1971. On that day Sioux City towed to its own fleet a number of barges, including the WBL-131, whereupon Sioux City’s tug, Rock Bluff, separated WBL-131 from the other barges in the tow and tied it into the Point Landing Fleet, fastening it to PCBL-105. The log of the Rock Bluff indicates that this occurred at approximately 5:40 in the afternoon. Approximately 40 hours later WBL-131 struck plaintiff’s water intake facility having broken loose from the Point Landing Fleet with PCBL-105. The two barges separated a short distance from the water intake facility with PCBL-105 running on the bank of the river a short distance before reaching the water intake. The captain of Rock Bluff testified that WBL-131 had been properly secured to PCBL-105.
Point Landing attempted to show that it had no notice of the arrival of WBL-131, but there is testimony from two witnesses to the effect that Point Landing was notified on March 5 that the barge was tied into the fleet.
One of these witnesses, the vice president of and dispatcher for Wisconsin testified that Point Landing had been its agent for the handling of Wisconsin’s barges since 1964 and following the usual established practice Point Landing was informed several days prior to March 5 that WBL-131 was expected to arrive at Point Landing’s fleet on March 5, and this witness further testified that Point Landing’s personnel informed his company on March 6 that WBL-131 was then in its fleet. *520 This evidence was sufficient to support a conclusion by the trial judge that Point Landing had actual knowledge that the barge was there. In any event, the evidence also showed that it was not unusual for a barge to be placed in the fleet without notice and that Point Landing routinely billed the owner after the barge’s presence was noted by Point Landing’s personnel. That being the practice, it was unreasonable for Point Landing to have no personnel on the shore or in the river watching or checking on the fleet between Friday afternoon and Sunday morning.
The testimony of Point Landing’s vice president, its shore superintendent and the captain of its fleeting tug clearly demonstrates that Point Landing was aware of its responsibility for maintaining the security of its fleet, but none of Point Landing’s personnel took any measure with respect to that security from the time WBL-131 arrived until, as a result of the barges breaking out of the fleet, the damage was done some 40 hours later. No one checked the lines securing PCBL-105 to the rest of the fleet, a duty clearly indicated from the prevailing condition of rising water on the Mississippi River and the existence of eddy currents at the Point Landing location. No attempt was made to put lights on the fleet, a duty clearly indicated in view of the warning such lights might have provided to passing river traffic so as to minimize the possibility of such traffic causing wakes which would disturb the security of the fleet during the nighttime hours of March 5 and March 6.
Point Landing’s man in charge of fleet safety and security had inspected the fleet and made some adjustments on March 1 and 2 when he found no eddy currents. But when he returned the WBL-131 to the fleet after the collision on March 7 he found a “pretty good eddy working there.” He said the condition of the river was such at that time that he took some of the up-river lines out of service “until the river calms down.” We can only speculate as to what caused the barges to break loose, but the most reasonable explanation would seem to be the combination of the rising river with eddy currents forming in or around the fleet after WBL-131 was tied off there.
In deciding this issue of Point Landing’s maritime liability we are bound by the decisions of the Federal Courts. When these decisions are applied to the facts of this case as we find them there is no basis for disturbing the trial court’s decision that Point Landing was legally responsible for this casualty. See Dow Chemical Company v. Barge UM-23B, 424 F.2d 307 (5th Cir. 1970).
In attempting to have Sioux City held liable for contribution, Point Landing attempts to discredit the testimony of the Rock Bluff’s captain and to cast suspicion on its log. Point Landing also makes much of conflicts between the testimony of the Rock Bluff captain and the captain and engineer aboard a ferry boat operating in the river at the time of the accident. The latter two witnesses insisted that they saw not only WBL-131 and the PCBL-105 floating down the river prior to the accident but also a great number of barges, from which Point Landing would have us infer that a large scale breakaway occurred from Sioux City’s fleet, sweeping WBL-131 and the PCBL-105 into their wake. But these conflicts in testimony along with a number of others were resolved by the trial judge in favor of Sioux City and there is no basis for our disturbing that decision.
Point Landing makes much over evidence and testimony indicating that Sioux City’s employees did not tie off WBL-131 properly and that this was the ultimate reason for the catastrophe. Had the collision occurred only a short time after WBL-131 was tied into Point Landing’s fleet, its case might be more convincing; but we have concluded that the WBL-131 was necessarily tied off properly in the *521 first instance because nothing happened to it for almost 40 hours and the many unfavorable inferences concerning Sioux City’s conduct, which Point Landing would have us draw, do not detract from the probability that the collision would never have occurred had Point Landing been reasonably prudent in the performance of its duty as the operator of a public fleet. Even a minimum amount of care on the part of Point Landing in checking the moorings at some point between Friday afternoon and Sunday morning would have, in all likelihood, prevented this catastrophe. Thus, there is ample evidence to support the trial judge’s conclusion of liability on the part of Point Landing and no evidence to show that the trial judge committed manifest error in rejecting Point Landing’s case for liability on the part of Sioux City.
We are aware of the fact that the trial judge in his reasons for judgment did not elucidate findings of fact and said only that he was adopting the brief of plaintiff’s counsel as his own reasons for judgment, and we note that this brief contains the statement that Sioux City was the last party to secure WBL-131 at the Point Landing Fleet and therefore “was responsible also for insuring that the mooring lines of the PCBL-10S was sufficient to hold both the WBL-131 and PCBL-105 in the fleet under normal expected conditions that could exist or arise during that period of the year in the River.” But the statements of fact in the brief all serve to support a finding of liability on the part of Point Landing alone. The trial judge concluded that “the negligence of Point Landing was the proximate cause of the accident and but for their negligence damages would not have occurred.” This exonerated Sioux City from any negligence with respect to tying off the barge and found Point Landing solely liable for failing in its duty to check the security of its fleet over the long period of time intervening between Sioux City’s activities and the occurrence of the collision.
QUANTUM
We are unable to find an explanation for the $216,153.91 figure awarded to plaintiff. The amounts sued for in the petition were itemized as follows:
Fromherz Engineers $1,870.49
Luling Construction Co., Inc. (For emergency services and reconstruction) ■ 211,221.54
Abadie Electric 959.80
Lloyd Alexander, Photographer 25.00
Edward Dufresne, Clerk of Court _20.00
$214,096.83
The judgment also set expert witness fees, including $2,500.00 for Frank From-herz.
There is no evidence in the record to support inclusion of amounts for Abadie Electric and Lloyd Alexander. The amount paid to the clerk of court should not be included since plaintiff was awarded all court costs. As to the figure of $1,870.49 for Fromherz Engineers, after some initial testimony which indicated a higher figure the record was clarified to show that plaintiff incurred engineering expenses with From-herz in the amount of $1,943.54 which it is entitled to recover, but the record does not justify the expert witness fee of $2,500.00. Fromherz testified that he spent seventeen hours in preparation for the trial and we estimate that he was on the witness stand for about five hours. His stated hourly fees were $25 for trial preparation and $50 for testifying, so that the judgment will be amended to set his expert witness at $700.00 instead of $2500.00.
We come now to plaintiff’s right to recover the $211,221.54 allegedly paid to Lul-ing Construction which presents a number of problems.
Immediately after the collision Luling Construction Company and P & L Contractors together were employed by plaintiff to provide temporary water intake service which had been disrupted. Between March 8 and March 28, 1971, these contractors *522 were paid the sum of $32,330.37. On March 29, 1971, plaintiff contracted with them now as a “joint venture” (hereinafter referred to as Luling-P&L) to replace the damaged water intake structure and to supply temporary water for the duration of the project for the sum of $171,880.00 plus the cost of their surety bond in the amount of $1,461.50. Over and above these amounts, Luling-P&L charged the Waterworks the sum of $5,549.-67 for furnishing labor, material and equipment to recondition two of the water pumps on the structure. Thus, the $211,221.54 paid to Luling-P&L consisted of those four items.
The water intake structure consisted of three pumps mounted on a platform in the river with the platform protected by a V-shaped fender system with the point of the V facing upstream. A bridge or catwalk connected the platform to the levee. After the collision, one of the pumps went out of service immediately, and by the second day after the collision a second pump was out of service. It was immediately apparent that some arrangements for temporary water service had to be made while the structure and the pumps were repaired. This led plaintiff’s Board of Commissioners to take immediate action to obtain a temporary water supply. Luling-P&L accomplished this by installing two pumps on the batture and tying them into the water intake pipes. For the next three weeks an inspection of the structure was conducted by a diver, marine surveys were made and questions of how to repair the structure and to continue providing temporary water intake service were considered at a number of meetings by the plaintiff’s Board in consultation with their engineer. During this time representatives of Point Landing offered an alternative method of providing water by means of pumps mounted on a barge in the river itself. Point Landing attacks the recovery by plaintiff of the item it paid to Luling-P&L for temporary water service between March 8 and March 28 on the ground that plaintiff did not minimize its damage by utilizing the plan proposed by Point Landing, and on the ground that the judgment did not provide a credit for the cost plaintiff would have incurred in the operation of the water intake structure during this period even if the collision had not occurred.
The evidence shows that Board members and their engineer considered the proposal of Point Landing and concluded that there were a number of unknown factors, such as the availability of a barge together with the cost of renting and insuring same, and the feasibility of mounting pumps on the barge which would operate in security and in a satisfactory manner, which led them to accept the simpler though perhaps more expensive plan put into effect by Luling-P&L. While it is well settled that a plaintiff must take reasonable steps to minimize damages he is not required to undertake á risky venture. Halliburton Oil Well Cementing Co. v. Millican, 171 F.2d 426 (5th Cir. 1948). Under the emergency circumstances which existed we cannot say that the plaintiff acted improperly in its decision to have Luling-P&L perform the services for the first three weeks, and the trial court correctly awarded this item to plaintiff.
As to the contention that Point Landing should be given a credit for plaintiff’s normal operating costs for its water intake system, a review of plaintiff’s annual audits does not demonstrate that the costs in question would have been significant so that the record does not support any such credit. Accordingly, insofar as the $32,330.37 item for temporary water service between March 8 and March 28 is concerned the judgment of the trial court is affirmed.
The critical question faced by the Waterworks and its engineer, Frank Fromherz, was the method of repairing the structure. Initially, the engineer had hoped to repair the existing structure, but on the basis of his inspection, corroborated by the opinions of *523 Marine Surveyors who inspected the structure, it was decided that repair was not feasible and that replacement of the structure was indicated. During this period of time Point Landing secured a proposal from H. B. Fowler & Company to replace the structure at a cost of $71,000.00. At the same time Luling-P&L proposed a replacement structure at a cost of $122,290.00. Fromherz rejected the Fowler proposal because he felt that the replacement structure was unlike the original structure in that the Fowler proposal was for an integrated structure mounted on five pilings with no separate fender system, while the Luling-P&L structure would consist of a platform mounted on four pilings to support the pumps with a separate fender system mounted on five pilings. In either case the structure (s) would be fabricated at a shop, floated to the site, put in place and then tied down to the pilings which would be driven through or around the structure (s),. He testified that this was essentially the same as the structure which was damaged except that the replacement structure would have one additional piling at the point of the V in the fender system whereas the damaged structure did not include this piling. Plaintiff, on the recommendation of its engineer, rejected the Fowler proposal and accepted the proposal of Luling-P&L. Thereafter a contract was signed between plaintiff and Luling-P&L, authorizing the construction and installation of the structure for $122,290.00, the supplying, of water during the construction period for $49,590.-00 and the cost of a surety bond for $1,461.-50. The trial judge awarded these amounts to plaintiff. Point Landing strenuously attacks these amounts, and we find merit in some of its contentions.
Beginning with the cost of replacing the structure, Point Landing contends that the structure provided by Luling-P&L was practically the same as the one offered by Fowler but at a cost of $49,000.00 more. Evidence shows that the members of the plaintiff’s Board relied exclusively upon the expertise of their engineer in deciding to award the contract to Luling-P&L. The record shows that Fromherz was the only qualified expert to testify on the subject of the two bids and the engineering basis for rejecting Fowler’s. He testified without equivocation that the Fowler plan was not adequate and the differences between it and the one accepted by plaintiff were substantial. Point Landing makes much over the fact that the bid of Luling-P&L, which led up to the contract it was awarded, incorporated much of the very language used in the Fowler bid which had been prepared earlier. This formal similarity can hardly provide a basis for rejecting the un-contradicted testimony of the engineer that the bids were substantially different, and we cannot say that the trial judge erred in finding that the Fowler bid was not properly rejected by plaintiff. However, while the bid of $122,290.00 formed the proper basis for the award the circumstances and the law require that this amount be reduced and that some credit be given to defendant against the cost of this new structure.
Established maritime jurisprudence is to the effect that in a case of a total loss, as distinguished from a repairable loss, the measure of damage is the market value of the property, but in a case where the market value cannot be determined resort must be had to other factors such as the original cost interpolated upwards so as to reflect present day costs, less depreciation. Manhattan, 85 F.2d 427 (3rd Cir. 1936), cert. den. 300 U.S. 654, 57 S.Ct. 432, 81 L.Ed. 864.
In Standard Oil Co. of New Jersey v. Southern Pac. Co., et al, 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890, where a vessel originally built in 1900 for $557,600.00 was repaired and improved in 1909 for $90,000.00, and sank in 1918, and whose cost of reproduction new was not less than $1,750,000.00, the court awarded $1,225,000.00, arriving at a total depreciation of 30% over an eighteen year period. A reading of that case shows *524 the many facts and circumstances the court considered pertinent in arriving at this depreciation factor.
In Cascadia Lumber Co., Inc. v. Double T Industrial, Inc., 162 F.Supp. 478 (Or.D.D.C.1958), the issue was the value of a barge lost while being repaired by defendant. Evidence showed that the barge was unique and that it was “a hybrid or an unorthodox vessel” for which there was no evidence of a reasonable ready cash value. The court applied a measure of damage, taking into consideration the fair reasonable cost of any ordinary barge of reasonable comparable carrying capacity, plus a cost of reasonably necessary repairs and maintenance ovér the period of service but less a reasonable depreciation factor.
The rule that depreciation is allowed in cases where the object has been destroyed has been consistent in maritime jurisprudence with the rule that where the object can be repaired defendant is likewise entitled to a credit for depreciation. For instance, in the case of Louisville & Nashville Railroad Co. v. M/V Ciudad De Turbo, 330 F.Supp. 769 (S.D.Ala.S.D.1971) plaintiff sought damages to the fender system of its railroad bridge which had been struck by defendant vessel. The court quoted with approval from Elgin, Joliet & Eastern Railway Co. v. American Commercial Line, Inc., 317 F.Supp. 175 (N.D.Ill.1970) as follows:
“The traditional rule with respect to damage done to land-based objects by vessels on navigable water, and the rule which applies to this case, is that an allowance is made for the depreciation of the damaged object at the time of the collision.”
To the same effect are Elgin, supra (damage to a protective fence around plaintiff’s bridge), Seaboard Airline Railroad Co. v. Marine Industries, Inc., 237 F.Supp. 10 (E.D.S.C., C.D.1964) (damage to dolphin and timbers protecting plaintiff’s railroad bridge), Patterson Terminals, Inc. v. S. S. Johannes Frans, 209 F.Supp. 705 (E.D.Pa.1962) (damage to dolphin connected to plaintiff’s pier). In the Seaboard Airline Railroad Co. case there appears the following:
“[unquestionably [the] libelant is entitled to have its bridge restored to the same condition prior to the subject collision insofar as reasonably possible. To do more or less would be inequitable and unjust to either libelant or respondent. Since the bridge was not a total loss and has no readily determined fair market value, the usual measure of damages, being the difference of fair market value immediately prior to collision and its value immediately after, cannot be applied in practicality by the court. Thus, the ends of justice demand that the measure of damages must necessarily be predicated upon reasonable cost of repairs with proper consideration being given the actual depreciation of the facility at the time of its damage”
Based upon the foregoing, we have concluded that the trial judge erred in failing to reduce plaintiff’s claim by some amount equivalent to the depreciation of plaintiff’s water intake structure.
The water intake structure with pumps and pipes was built in 1950 at a cost of $35,972.06. Over the years pumps were replaced and a catwalk was added in 1959. It sustained damage from collisions in December, 1956, February, 1958, and especially in September, 1965, during Hurricane Betsy. After each occasion the structure was repaired with over $29,000.00 of repairs made after Hurricane Betsy.
From the very nature of the object in question, it is apparent that it had no market value at the time of the collision so that the optimum method of arriving at damages is not available. What we have, however, is the actual cost of constructing and installing a new thing to serve the same purpose and to function as well as the thing which was damaged.
There is much detailed testimony by Fromherz to support his opinion that the *525 value of the entire water intake structure on the day of the collision was $148,921.00. He arrived at this value by accepting the contract price for replacement of the main structure and adding to this contract price the cost of the catwalk built in 1959, the screens built in 1951 and the cost of the three pumps installed in 1959, 1965 and 1969, arriving at an “undepreciated value” of $177,287.86, from which he subtracted depreciation based on a 75-year life expectancy with an assignment of 12 years of age. This method is not reasonable under the circumstances of this case and does not meet the test of the jurisprudence which has been cited. The only object which was damaged and replaced was the platform itself with the surrounding fender system. The contract price did not include an item of $5,549.67 to repair the pumps for which plaintiff is clearly entitled to recovery. The catwalk was not involved in the restoration work because it was not damaged in the collision and no part of the contract involved restoration of this item.
The testimony was that before this collision the platform and screens were functioning perfectly and were serving the purpose for which they were intended. After the replacement was made the new platform and fender system likewise functioned perfectly and served their purpose. Therefore, plaintiff is entitled to recover only the contract price for repairing the structure itself less a reasonable depreciation.
We will accept the testimony of Mr. Fromherz to the effect that the structure had a life expectancy of 75 years, and his twelve years of depreciation to the structure. While it is true that even after the repairs were made following Hurricane Betsy the pump platform was still twisted twelve to fifteen degrees and the new structure build in 1971 was an improvement over the old structure, especially with the addition of a piling at the point of the V in the fender system which surely made it more durable and provided greater protection to the platform, these factors were apparently considered by Fromherz along with the fact that while the structure was twenty years old substantial repairs were made over these years, expecially in 1965.
Returning to the contract price of $122,290.00, we have concluded that the price itself is not recoverable in full because plaintiff failed to mitigate its damage in this regard. Luling-P&L performed extensive work in connection with supplying water for which they were paid. But in connection with the construction and installation of the platform and fender system they acted only as an intermediary between plaintiff and Lane & Company, an experienced marine contractor, who did all of the work on this phase of the contract. Plaintiff could have contracted directly with Lane & Company for the price Lul-ing-P&L paid to Lane, namely $110,860.00. We have concluded that plaintiff is entitled to recover this amount less twelve years of depreciation or a net amount of $93,122.40 for replacing the structure.
The final item of damage to be considered is the sum of $49,590.00 which was included in the contract with Luling-P&L for furnishing water during the time of construction of the replacement structure. While an emergency clearly existed immediately after the collision of March 7 which justified the payment to Luling-P&L of $32,330.37 for supplying water between March 8 and March 28 the conditions were not so acute when the contract was awarded for the construction period. The minutes of the meeting of plaintiff’s Board show that there were some serious questions and considerable hesitation on the part of the members regarding the cost of this temporary water supply. When the contract was negotiated it was anticipated that the replacement structure would be completed and installed in ten weeks, so that the price of supplying water was computed at $5,000.00 per week. Board members questioned particularly the price for the rental of the two pumps which, for the- *526 week of March 22 through March 28, had cost $1,800.00, and which the Board knew could have been rented for considerably le^s. Before the contract was signed with Luling-P&L, Point Landing made available to the Board a bid for furnishing the pumps and three hoses for each at a cost of $620.00 per week. While there is no breakdown to show what part of the $49,590.00 figure paid to Luling-P&L for furnishing water consisted of pump rental it is probable that the figure was based on the rental for the week of March 22 through March 28. When the contract was signed it was contemplated that the job would take ten weeks whereas it took fourteen weeks. Thus, the $18,000.00 total for pump rental amounted to $1,286.00 per week as opposed to $620.00 per week for which they were available. We have thus concluded that Point Landing is entitled to a credit of $666.00 for fourteen weeks, or $9,324.00 against the $49,590.00 Luling-P&L was paid.
Summing up, we have concluded that plaintiff is entitled to a judgment for the following amounts:
Temporary water supply between March 8 and March 28 $32,330.37
Water supply for the duration of construction and Installation of the new intake structure 40,266.00
Cost of repairing pumps 5,549.67
Restoration and installation of new intake structure 93,122.40
Cost of surety bond 1,461.50
Frank Fromherz Engineering Services 1,943.54
Total 174,673.48
The judgment will be amended accordingly.
INDEMNITY
The trial judge awarded full indemnity to Port City and Wisconsin, the owners of the two barges involved in this incident, and in favor of Sioux City against Point Landing. Sioux City has, in this Court, waived indemnity, so that the judgment will be amended accordingly.
Point Landing disputes Port City’s right to indemnity on the theory that it proved no contract with Point Landing in the first instance. The evidence shows that Point Landing was a contractual bailee which routinely accepted barges .such as the PCBD-105 into its fleet for a regular posted charge, and under the cases cited earlier in this opinion it was a contractual bailee under maritime law.
In the case of Dow Chemical Company v. Barge UM-23B, supra which involved a factual situation identical to the instant case, the court held that the owner of the barge was entitled to costs and attorney’s fees in successfully defending the claims asserted against it. Point Landing disputes the rationale of this decision, but under the circumstances we are bound to follow same, and any change in that maritime jurisprudence would have to come about in the federal court which spawned it.
The same disposition would follow with respect to Wisconsin except that Point Landing raises the additional objection that it was denied due process in defending against that claim because of the untimely filing of the indemnity claim by Wisconsin. The record shows that the Wisconsin petition was filed long after the trial of the case commenced, and Point Landing filed an exception of no cause of action on the basis of the untimeliness of the petition. Nevertheless Point Landing also filed an answer so that the issue was joined on the action for indemnity.
If we could conceive of any evidence which Point Landing might have offered bearing on the question of Wisconsin’s right to contractual indemnity and which they were deprived of entering because of the late filing of the claim for indemnity by Wisconsin we would not hesitate to dismiss the claim, but the question of the right to indemnity is a pure legal question based upon the facts of the case, which were completely developed by Point Landing, along with the other principal parties to this litigation. The ends of justice would not be served by dismissing the Wis *527 consin claim only to require that a new suit be filed for the purpose of advancing legal arguments where all of the facts have already been established in the lengthy trial of this case. We have concluded that this matter is ripe for a judgment at this time in view of the stipulation by all parties that the amount of costs and attorney’s fees will be established by way of arbitration after this litigation is completed.
Accordingly, the judgment appealed from is amended in these respects: First, the amount of the judgment in favor of plaintiff and against defendant, Point Landing, Inc., is reduced to $174,673.48; second, there is no indemnity in favor of Sioux City and New Orleans Terminal Corp., against Point Landing, Inc.; and third, the expert witness fee for Frank Fromherz is reduced to $700.00. In all other respects the judgment is affirmed. Costs of this appeal are to be divided equally between plaintiff and Point Landing, Inc.
AMENDED AND AFFIRMED.